JAMES A. WAREHAM, Respondent, *v.* EAGLE SAVINGS AND LOAN COMPANY, Appellant.

Second Department, July 31, 1918.

**Savings and loan companies — suit by member for rescission of shares and for recovery of deposits — fraud — evidence.**

In a suit to secure the cancellation of shares or subscriptions in a savings and loan company and for the recovery of money paid, upon the ground that the plaintiff had made deposits in reliance upon statements by the defendant that it was doing a banking business based on deposits and withdrawals upon open account, the same as in savings and business banks, evidence *held*, to sustain the conclusions of the trial court that plaintiff was deceived by the fraudulent representations of the defendant, and that a decree for rescission should be granted.

MILLS and THOMAS, JJ., dissented, with opinion.

APPEAL by the defendant, Eagle Savings and Loan Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 30th day of November, 1917, upon the decision of the court after a trial at the Kings County Special Term.

Defendant is a savings and loan association, existing by virtue of the laws of New York, now article 10 of the Banking

Law (Consol. Laws, chap. 2 [Laws of 1914, chap. 369], as amd.).

The complaint alleged that on and after June 18, 1907, defendant represented to plaintiff and to others, to induce deposits of savings with it, that defendant was doing a banking business based on deposits and withdrawals on open account the same as in savings and business banks; that it would receive deposits for checking account, and would repay all or any part thereof to plaintiff or to his order, at any time on demand, with four per cent interest on any balances to plaintiff's credit; that plaintiff, relying on such statements, was induced to deposit $400 on June 18, 1907, and sundry other payments between that date and October 5, 1914, amounting in all to $1,724, against which plaintiff had withdrawn $200 by an ordinary commercial bank check, leaving a balance to plaintiff's credit of $1,524, with interest. Plaintiff also averred that he had received a pass book in which such deposits and withdrawals were entered; that plaintiff had not subscribed for any shares; that any entry of plaintiff's name as a subscriber to shares was without plaintiff's knowledge or consent; that he never received any certificate of share ownership; that, having learned that his name had been entered as a subscriber for thirty shares, thereby apparently obligating him to pay $2,600 in addition to the $400 originally deposited, and having discovered the falsity of defendant's representations, the plaintiff presented his pass book and offered to surrender same on being paid the balance to his credit, and asked that his name be stricken from defendant's books as a shareholder, also that defendant cancel any such shares so issued to him, which defendant refused. The complaint also averred that such agreement to receive such deposits and to pay interest thereon was *ultra vires* and void. Plaintiff asked the relief that such shares or subscription be canceled, with a recovery of the sum of $1,524 so paid.

The answer admitted defendant's incorporation; that plaintiff had filed a notice of withdrawal of his balance on class B savings shares of defendant, with a general denial of plaintiff's other allegations.

The court found that defendant made the representations alleged; that thereby plaintiff was deceived into the belief

that defendant did a banking business; that when plaintiff made his first deposit of $400 defendant induced him to sign a card by telling plaintiff " that it was an identification card whereon defendant, without plaintiff's knowledge or consent, wrote the figures ' 30 ' between the words ' subscription ' and ' shares ' printed on said card, but plaintiff never intended to subscribe for shares nor knew that he was or was deemed to be subscribing for shares, and plaintiff never received any shares or any certificate evidencing his alleged subscription or ownership of shares." The court also found that before January 1, 1915, plaintiff had presented his pass book to the defendant, and demanded payment of the moneys due him, with cancellation of such shares, which defendant had refused.

The court refused to find, as defendant had requested, that by an order of this Appellate Division (*Matter of Eagle Savings & Loan Co.*, 164 App. Div. 867), bearing date December 11, 1914, the defendant's liability to plaintiff had been reduced nine and eighteen one-hundredths per cent, amounting to $192.22.

*Almet Reed Latson*, for the appellant.

*Joseph R. Clevenger*, for the respondent.

PUTNAM, J.:

This record, accompanied by the original exhibits, amply supports the findings of fact. On the one side were the plaintiff's positive statements, against which were denials by the defendant's secretary which became materially qualified on cross-examination. Asked what Mr. Wareham said when he came into defendant's office, Mr. Wood, the secretary, testified: " That he wanted — well, substantially he wanted an account that he could deposit, make payments and draw money out when he chose. Q. Did he say he wanted to subscribe for shares? A. Well, he certainly did, because I — Q. Did he request you, did he ask you, did he say that he wanted to subscribe for shares when he first came in? A. I can't just recollect what his wording was. * * * Q. When Mr. Wareham came to the window with his money,

did he say that he wished to subscribe for shares before you mentioned anything about shares to him? A. I don't recollect that. Q. Don't you know that he did not? A. I don't recollect whether he did or not."

The secretary finally admitted that he then knew that plaintiff wanted to deposit money and not to borrow money, so that he could withdraw any or all of such deposit at any time. Also that he told plaintiff he could do so, and further that he did not say anything to plaintiff about any sixty-day notice before such withdrawal. Regarding the witness' statement that he had told plaintiff he was subscribing for thirty shares, he testified on cross-examination: " Q. You say you told Mr. Wareham that he was subscribing for 30 shares? A. Yes, sir. Q. What did Mr. Wareham say? A. I don't recollect what Mr. Wareham said, but he subscribed for them. * * * Q. Did you tell him what was the face amount of the shares? A. No, I might not unless he asked me. Q. Do you recollect whether he did or did not? A. I don't recollect it. Q. Did you tell him that he would be required to make payments on account of shares? A. I don't recall just the conversation on those particular — on that particular thing. Q. Did you tell him that by subscribing for shares he would become a member of the defendant? A. Not necessarily. Q. Did you? Can you testify affirmatively that you told him that he would become a member? A. I only testified now to just that — answered to that question. Q. Did you tell Mr. Wareham that he might by subscribing to shares have to pay losses in case the company had losses? A. Why, no, I did not. Q. You knew that Mr. Wareham thought at the time he deposited that money that he was opening an account with you by which he could draw by check from time to time, didn't you? A. No. Q. Didn't you tell him that? A. No. Q. Did you tell him that he could deposit money with you and withdraw any or all of it as he pleased? A. Yes."

We find no ground to question the conclusions of the learned court, who had the advantage of seeing the witnesses.

The point, however, remains, whether the facts found justify a decree for rescission.

Defendant's future ability to pay a certain rate of interest

was not the point represented. The representation went directly to the root of the mutual relations, leading plaintiff to part with his savings on the belief that he was and would be a depositor pure and simple, not a subscriber for $3,000 in defendant's shares, and hence a participant in its risks.

The peculiar forms of the " signature card," " deposit slip," and the " pass book," all simulated like incidents of accounts with a bank. Such close resemblances (save parts in finer print) would naturally mislead an unskilled customer. By them defendant was obviously held out as a bank, upon which checks passed current. The circumstance that the promise to pay was *in futuro* did not make these false appearances the less fraudulent.

A depositor in a genuine bank can withdraw his money although such right may be a qualified one. A subscription contract for shares, if *bona fide*, raises an indebtedness to be gradually paid off, followed by delivery of share certificates. Here this was industriously put out of sight by the practice of the depositors' free checking, so that checks on defendant, like those of a real bank, passed through the New York Clearing House. Such convenient check books brought in new customers and quieted any doubts of those already enrolled. How indeed should they surmise that back of this complete guise of a regular bank lay a subscription contract for enough " shares " to absorb all their accumulated savings? The judgment, therefore, rightly treated the plaintiff as deceived and defrauded, and afforded him the fitting remedy of rescission.

Such disposition follows our prior rulings as to this same defendant. (*Miller* v. *Eagle Savings & Loan Co.*, 174 App. Div. 581; *Babeuf* v. *Eagle Savings & Loan Co.*, 180 id. 909; *Wilcock* v. *Eagle Savings & Loan Co.*, Id. 911; *Fox* v. *Eagle Savings & Loan Co.*, Id. 909; *Payne* v. *Eagle Savings & Loan Co.*, Id. 910.) We are unable to follow *Rosenkranz* v. *Eagle Savings & Loan Co.* (180 App. Div. 388), which passed on testimony different from that in the case here.

The judgment should be affirmed, with costs.

BLACKMAR and KELLY, JJ., concurred; MILLS, J., read for reversal, with whom THOMAS, J., concurred.

MILLS, J. (dissenting):

I find myself unable to agree with the majority opinion written by Mr. Justice PUTNAM, and feel compelled to dissent therefrom. As it was stated upon the argument that the defendant has many accounts like those of the plaintiff and, therefore, this decision may be of importance as a precedent, and also, as it is claimed in that opinion, in effect, that our decision herein " follows our prior rulings " in certain cited cases in which I wrote for the court or a majority thereof, I deem myself warranted in expressing my views herein at some length.

This appeal was argued and submitted with an appeal by the same defendant in each of two other similar cases against the same defendant, one by Cornelius A. Robb as plaintiff and the other by Alfred H. Bronson as plaintiff. (*Robb* v. *Eagle Savings & Loan Co.*, 185 App. Div. 896; *Bronson* v. *Eagle Savings & Loan Co.*, Id. 893.) All three cases were by consent of counsel tried together before the same justice at the same Special Term, upon substantially the same evidence. A separate decision was made in each case and a separate judgment entered thereon. This opinion is designed to apply to each of said actions and appeals.

Beyond the formal allegations as to the character of the defendant, etc., the gist of the complaint is: (a) That defendant represented to plaintiff that it was doing a banking business " the same as in a savings or business bank," and that it would receive from the plaintiff moneys and repay them to him, in whole or in part, at any time upon demand, with four per cent interest upon daily balances; (b) that plaintiff, believing each of said statements to be true and relying thereon, made with the defendant sundry deposits; (c) that each of the said statements so made by defendant was false and made with the intent " to deceive and did deceive and defraud plaintiff;" (d) that the contract so made between plaintiff and defendant in accordance with said representations was *ultra vires* and beyond the defendant's powers; and (e) that the plaintiff, after discovering the falsity of said representations, had demanded from the defendant payment of the balance of his said deposits then outstanding, which defendant had failed to make.

The answer, after admitting the formal allegations of the complaint, denied the other, except that it admitted that the plaintiff had made such demand and defendant such refusal. The learned trial justice in his decision, as to other than the formal facts, found (a) that on a certain date, being that of the opening of the account, the defendant " stated to plaintiff that it would receive his money as bank deposits and repay same on his demand and pay 4% per annum on every dollar for every day it remained on deposit;" (b) that plaintiff believed the said statements to be true and in reliance thereon made the said sundry deposits; (c) that each of said statements was false and known by defendant to be false and made by it with the intent thereby to deceive and defraud the plaintiff, and that the said statements had that effect; (d) that defendant had no power to do any such business or to make the contract thus made in words with the plaintiff; and, as conclusions of law, the trial justice decided that defendant should strike the plaintiff's name from its books as a shareholder and cancel all certificates purporting to show him to be a shareholder, and that the plaintiff was entitled to recover from the defendant the balance of his such account and dealings then unpaid, with interest, and that judgment accordingly be entered, which was done.

Such determination, so far as it found fraud, was plainly unwarranted because the facts actually found constituted only a promise in a present transaction as to what the defendant would do in the future, that is, repay the money in a certain way. No statement as to any then existing fact was found, which in general, except perhaps in cases of confidential relation, must exist as a basis of fraud. The decision, however, was in effect a finding that the parties, as to the account or dealing, really at its inception made a contract that the plaintiff should receive at all events interest upon the daily balance of his deposits at the rate of four per cent a year and should be entitled to withdraw the deposits and interest, or any part thereof, at any time upon demand; and that the defendant was forbidden by law to make such a contract. Upon that theory, under our decision in *Miller* v. *Eagle Savings & Loan Co.* (174 App. Div. 581), the plaintiff would be entitled to have the shares, which defendant had purported

to issue to him, canceled and then to recover the balance due him as for money had and received, and, therefore, to have his judgment here affirmed upon the ground of the illegal nature of the contract.

The main contention of the appellant here is that the finding that such was the real nature of the contract between the parties is against the evidence.

Obviously the finding as to what the contract really made was rests mainly upon the evidence as to what defendant's representative at its office said to the plaintiff when the plaintiff opened the account. In this respect the evidence is substantially the same in each of the three cases. Perhaps in the *Wareham* case it was as clear and favorable to the plaintiff as in any of the others. In that case the plaintiff testified, in substance, that, having entered the defendant's office, he was directed to the window or desk of Mr. Wood, who was defendant's secretary and treasurer; and that he, the plaintiff, asked Wood if they did a banking business and if he could start a savings account, and that Wood replied " yes," and that their rate of interest was four per cent with the special advantage that they allowed interest on every dollar from the very day of deposit, and that they would honor checks or drafts upon the fund at any or all times; and that further, upon such assurance, plaintiff opened the account and made the initial deposit, receiving a pass book, but no certificate or other evidence.

The appellant's counsel criticises such testimony, or rather such summary of it, upon the ground that the part of the original interrogation as to the doing a banking business was really not answered by the witness. This criticism seems to be correct, but in at least one of the other cases the testimony to that effect was positive, and I think that in this, the *Wareham* case, it warranted the same inference. The pass book so delivered and received was put in evidence and has been submitted to us. Upon the two introductory pages there are entries, then made, clearly and precisely showing that plaintiff was made a shareholder, and that those pages were the certificate of such holding. The second such page is headed by the number, in the *Wareham* case, " 3100;" in the next line the words " Class ' B,' " being the class of

defendant's shares; and " Date of Certificate, June 18, 1907," which was the date of opening the account. The first page, being the inside of the cover, in large print contains the statement that the company has the right " at any time to decline to make loans on stock," and that no single loan will be made which exceeds ninety per cent of the withdrawal value of the shares, and also that sixty days' notice must be given to withdraw the shares and close the account. The inner pages of the book are divided into the left-hand page for the entry of payments or deposits by the plaintiff, and the right-hand page for payments made to him. Each such page is headed, after the general statement " Eagle Savings and Loan Company In account with James A. Wareham," with this line: " Certificate No. 3100 30 Class ' B ' Shares." The left-hand page is divided longitudinally into three divisions, the first headed " Date," the second " Payment," and the third " Received by," and when the book was first delivered to plaintiff it contained, in the first such division, " 1907, June 18," in the second " 400," being the amount of the first deposit, and the third the initials of the receiving teller. The right-hand page is also divided into three such divisions, the first headed " Date," the second " Loan," and the third " Made by," and underneath the word " Forward," and in those the payments made to the plaintiff were entered from time to time as they were made, the amount thereof being entered in the division headed " Loan." Those appear more in the other two books than in the *Wareham* book. The pass book of course remained always in the possession of the plaintiff. At the opening of the account plaintiff also signed an identification card, which began with these words: " Class ' B ' No. 3100 Subscription 30 Shares," but of course that card remained with the defendant, and it does not appear that it was afterwards seen by the plaintiff until upon the trial. The plaintiff testified, in effect, that he did not notice, even during the many years of the currency of the account, the fact that the pass book purported to show him as a shareholder; and that at its opening he did not notice it, nor was his attention in any way called to the fact by defendant's representative. That representative, however, upon the other

hand, testified that he did expressly call the plaintiff's attention to that situation and explain to him the nature of the defendant's business and the character of each of the different classes of shares which it issued.

The Appellate Division in the First Department has quite recently decided a similar appeal in a like case against this defendant, reversing a like judgment for a plaintiff and dismissing the complaint. (*Rosenkranz* v. *Eagle Savings & Loan Co.*, 180 App. Div. 388.)

In that case the plaintiff had deposited money with this defendant under a similar pass book, nominally as the holder of some of its " Class ' B ' Savings Shares." The action there was similar in character to this. Upon the trial at Special Term the plaintiff obtained a like judgment. He gave a similar narrative to that given by the plaintiff herein as to the inception of the account, that is, the transaction at its opening, and the statements then made to him by defendant's representative. He claimed that he was thereby led to believe that he was making his deposit in what was equivalent to a savings bank. The opinion held that, at least in view of the plaintiff's ignorance, he being a foreigner and unable to read or write, it is entirely likely that he did so misunderstand the situation. That court, however, held that even if such representation was made, viz., in substance, that defendant was doing a banking business like a savings bank, there was no real falsity about it — in other words, that the situation or right of the holder of Class B shares in defendant is practically the same as that of a depositor in any ordinary savings bank, viz., the right at all events to receive his money back with the dividends, namely, interest upon demand, with previous notice of intent to withdraw if defendant required the notice, subject only to " the risk of having his deposit reduced ratably with others in like position with himself," if the defendant became unable through misfortune to repay all depositors in full. (180 App. Div. 392.) The opinion further stated that it was immaterial that in this defendant's business " the deposits were called ' dues,' the withdrawals ' loans,' and the interest ' dividends.' " (180 App. Div. 393.) It seems to me that this view of the matter is entirely correct.

These three accounts were opened, respectively, as follows, viz., the Wareham on June 18, 1907, the Robb on July 20, 1911, and the Bronson on November 7, 1912. By the amendment to the governing statutes made by chapter 126 of the Laws of 1910, these savings shares were expressly authorized. (See Banking Law [Consol. Laws, chap. 2; Laws of 1909, chap. 10], § 215, subd. b, as amd. by Laws of 1910, chap. 126.) I do not find that they were expressly authorized by statute prior to that act. (See Laws of 1909, chap. 10, § 214.) It is quite likely that they were impliedly authorized within the doctrine of *People ex rel. Fairchild* v. *Preston* (140 N. Y. 549). The statute, as thus amended in 1910, provided as to such shares, (a) that the payments, namely, dues, shall be paid " in such sums and at such times as the holder thereof may elect;" (b) that the dividends shall be credited to such shares " at a rate not less than sixty per centum nor more than ninety per centum of the rate of dividend apportioned and credited to instalment shares, as the by-laws shall determine;" and (c) that " There shall be no fine for nonpayment of dues nor any forfeiture of such shares;" and defendant's articles do provide for the payments, and that the shares shall be credited with dividends not exceeding four per centum per annum, and that the holders of such shares shall not be subject to fine for non-payment of dues, and that no withdrawal fees shall be charged against such shares. No doubt the latter provision in both statute and articles is necessarily incident to the right to make the payments as the holder may elect. In short, as to class " B " shares, under that system, there is no obligation upon the holder to make a payment at any time or to make any further payment or deposit. Under other provisions of defendant's by-laws sixty days' notice of withdrawal, that is, of payments to the depositor, must be given unless the board of trustees waive such notice. Such requirement of notice of withdrawal is substantially the same as that made by every savings bank and printed upon the introductory page of its every pass book, although such notice is very seldom required by such a bank. In like manner the fore page of the pass book in this case contains the statement in large type that the company has the right to decline to make any loans on the stock, as its payments

are therein called, and that it will make no single loan, that is, payment, to exceed ninety per cent of the withdrawal value of the shares, and that the total balance or credit cannot be withdrawn so as to close the account, unless sixty days' previous notice has been given. I quite agree with the opinion in the *Rosenkranz Case* (*supra*), that in all this no substantial difference exists between defendant's business in reference to these shares and the ordinary business of a savings bank. Moreover, I agree with that opinion in the view evidently taken by that court that for the teller of such an institution as this defendant to say to a proposed depositor, " We do a banking business and pay four per cent interest and will repay your money at any time you ask for it," where, as here, the habit was with the trustees to waive notice of withdrawal and to pay four per cent interest or dividends, was not the making of a false or fraudulent statement simply because the information was not also given that the trustees could require sixty days' notice of the demand for such payment, and that all the payments were subject to the risk of the bank or institution becoming insolvent. I presume that hundreds of savings bank receiving tellers have inadvertently and quite honestly made similar statements. In these particular cases each of the plaintiffs, evidently intelligent persons and not ignorant as the plaintiff in the *Rosenkranz Case* (*supra*), received at once, with his initial deposit, the pass book as evidence of his status with the defendant, which book, upon its introductory pages, clearly set forth that his status was that of a shareholder and gave to him in brief a clear statement of his main rights in the leading important respects, except his liability to share in the losses of the defendant's business if it should become unable to pay dividends at the represented rate of four per cent, or even to repay the principal of the deposits in full. The claim of the plaintiff's counsel, in all of his numerous cases against this defendant, which have come before us, has been, as it is in this, that his client, the particular plaintiff, stood in the position of a creditor of the defendant and so entitled to be preferred over all its member shareholders. We have not sustained that position in a single instance, and I think that we should not sustain it here, and that we should

hold that the evidence did not warrant a finding that the contract between defendant and plaintiff was so entirely absolute as to require payment of either interest or principal without the risk of abatement, if defendant's resources become insufficient. In other words, I think that, with the pass book and its plain reference to shares, it cannot reasonably be held that the plaintiff, with his intelligence, received it under any different impression than that he was doing business with the defendant substantially as a savings bank, except that the defendant gave him the advantage of allowing him interest upon his daily balances instead of interest only from a given date, *e. g.*, January first or July first, as is the practice of an ordinary savings bank. Such a business is, in real substance, a savings bank business, and for the receiving teller or representative of the defendant to so characterize it constitutes no fraud and no falsity. In common parlance it may very properly be so termed. Indeed, one of these very plaintiffs, Mr. Bronson, who evidently has had a very large business experience, testified that he had not yet learned that defendant did not do a regular banking business. The statement which the various plaintiffs impute to defendant's representative amounts at the most to one that defendant was doing a savings bank business, but allowing interest upon each dollar from the very day of its deposit. It may be noted that defendant's representative testified that he informed each one of the different kind of shares in defendant's business, and that each plaintiff, upon being recalled, merely denied that such representative told him that he was " subscribing for 30 shares of the maturity value of $100 each." For instance, the plaintiff Bronson did not at all deny the testimony of defendant's treasurer that he, Bronson, had been at defendant's office frequently before the opening of this account and talked with the treasurer fully as to the nature of defendant's business.

The question now arises: Is not the plaintiff in each of these cases, upon defendant's own evidence and the undisputed facts, entitled to recover under our recent decision in the case of *Wallis* v. *Eagle Savings & Loan Co.* (180 App. Div. 719), decided by us on December twenty-ninth last? The evidence in this record shows that each plaintiff, before the

commencement of the action, had given defendant fully sixty days' notice of withdrawal of his account, and indeed the answers admit that fact. That being true, plaintiff was entitled to receive his money before he commenced the action, unless defendant's funds had been so depleted by losses or previously noticed withdrawals that it was unable to make the requisite payment. The answers allege no such defense, and in this record there appears no evidence even of the facts, if they exist, which would upon such ground defeat or postpone plaintiff's right to payment. In the *Wallis Case* (*supra*) said defense was attempted to be pleaded. In that case we intimated the view that the burden, both of allegation and proof of such facts, rested upon the defendant, but, as that question was not directly involved, we did not decide it. I think, however, that such intimation correctly stated the law and that we should so hold. (See opinion in the *Wallis* case.) Therefore, if the plaintiff herein had brought an action at law to recover the balance due him upon his account, and the evidence had been the same as it was upon the trial, he would have been entitled to a direction of a verdict in his favor. The question, therefore, is presented: Shall we upon that ground sustain his recovery already had? He chose, however, to bring his action in equity, practically upon the ground of defendant's fraud in securing from him the contract apparently made by his pass book, and incidentally thereto to recover, as damages, the balance due him. I understand the rule to be that where one brings an action in equity and it turns out upon the trial that when he began the action he had no claim in equity, but one at law, he cannot be permitted to recover upon the latter claim; but that where he had at the commencement of the action a claim in equity and incidentally thereto a right to law relief, *e. g.*, to recover damages, and pending the action the claim in equity has somehow lapsed, he may, nevertheless, at the trial be given the incidental legal relief. (*McNulty v. Mt. Morris El. Light Co.*, 172 N. Y. 410, 412; *Van Allen v. N. Y. E. R. R. Co.*, 144 id. 174, 179.)

In these cases the defendant, to meet the complaints, had no need to plead as a defense the want of sufficient funds through losses or unsatisfied prior notices of withdrawal, if

such defense could be made upon the merits, and hence it may be presumed defendant did not plead any such defense.

The defendant, at the close of the trial, offered in evidence the order of this court, made on December 11, 1914, purporting to reduce defendant's liability to its then members .0918 per cent. It was received in evidence over plaintiff's objection, although it was not pleaded as a partial defense or otherwise, but that ground of objection was not specified. For the reasons stated by us in our opinion in the *Wallis Case* (*supra*) we do not consider that the mere fact of the making of that order is available to the defendant in such a case in partial reduction of the plaintiffs' claim. As intimated by us in our second memorandum in the first *Miller Case* (176 App. Div. 883), it seems impossible in an action by a single member against the defendant to determine and adjust the equities between the defendant's members by classes or individuals, in the distribution of losses. However that may be, in the instant cases that question is a mere abstraction, as the record does not present the facts upon which such a distribution can be made, even if the making of it be possible in such an action.

It remains to be considered whether or not the conclusions which I have reached are inconsistent with our decision in any one of the other cases against this defendant. I do not so regard it. In the first *Miller Case* (174 App. Div. 581) we practically sustained a finding made at the Trial Special Term, that the defendant had made with the plaintiffs there, borrowing members upon class " A " shares, a contract that they should pay the monthly dues " for not exceeding 144 months," and that at the end of that period the shares should be matured, that is, fully paid in and the mortgage loan canceled, although the bond and mortgage given by the plaintiffs to the defendant provided that such payment should continue until the shares should mature. In that case, however, the plaintiffs, when they made their proposal to the defendant, signed a written application to the defendant and the same was approved and accepted by defendant's executive committee. Such application was put in evidence, and it expressly provided for the said limitation of 144 months. As to that, therefore, the proof in the case was absolute and

admitted of no possible question. The testimony of the plaintiffs was also to the effect that they signed the bond and mortgage upon the statement of defendant's representative that they accorded fully with the application and in entire ignorance upon their part that they did not, and of course the bond and mortgage had remained throughout in possession of the defendant. Even so I in my original report advised that such finding was against the weight of the evidence, but no one of my associates agreed with me in that respect and in the end I acquiesced in their view. (See 174 App. Div. 584, 585.) We then held that the contract so found to have been in fact made was one which the defendant was by statute forbidden to make and gave to the plaintiffs relief by way of its rescission. These instant cases differ in principle from that in the fact that in this record the only writings by the parties at the time of the making of the contract are inconsistent with the plaintiff's claim. Every one of them shows that the plaintiff was made a shareholder, and no one of them intimates any liability except as to a member shareholder.

In the later *Babeuf, Payne, Wilcock* and second *Miller Cases* (180 App. Div. 909, 910, 911) we upheld the decision of the Special Term to the same effect, but in each of those cases the controlling feature of a like written application appeared. In the *Fox* and *Sogn Cases* (180 App. Div. 909, 910), where the decision of the Trial Special Term had been the other way, we upheld such decision. In the *Fox* case there was no proof of such written application, but there was that proof in the *Sogn* case. In our memorandum in the latter case we stated that our decision in the first *Miller* case was not to be construed as overruling our decision in *Eagle Savings & Loan Co.* v. *Beakey* (163 App. Div. 860), in whch we had sustained a judgment in favor of a defendant in a like case where there was proof of such a written application and the same was produced and put in evidence, but that our view was that in such a case the finding of the Trial Term either way, upon the issue of the nature of the contract actually made, would have to be sustained here. Our such expression was used of the case where the element of such a written application — that is, a cotemporaneous writing containing

expressly the limitation alleged by the plaintiff, was proven. In the instant cases that element is not only entirely wanting, but the opposite of it clearly appears.

The *Wallis* case, decided by us last December, did not present the element of a claim that the real contract was other than that of a member or holder of shares of class " C," but merely presented the question of the rights of the plaintiff as such member and shareholder. Therefore, it constitutes no precedent for this case, except as to some collateral points therein discussed. I perceive, therefore, no real inconsistency between my views hereinbefore expressed and our decision in either of those prior cases.

My conclusion, therefore, is that the judgment appealed from in each of these cases should be reversed, with costs, and the complaint dismissed, with costs, without prejudice to any action by the plaintiff to enforce his rights as one of the defendant's members, as a holder of some of its class " B " shares; and that in the *Wareham* case the following findings of fact in the decision and conclusions of law be reversed, viz., findings 2, 3, 4, 5, 6 and 7, and conclusions 1, 2 and 3; and that we allow and find the following of the defendant's proposed findings of fact and conclusions of law in that case, viz., findings II, III, IV, VII and IX, and conclusions II and III, and that we should make the same disposition in each of the other two cases.

THOMAS, J., concurred.

Judgment affirmed, with costs.